844 So.2d 198 (2003)
STATE of Louisiana
v.
Ryan WATSON.
No. 02-KA-1154.
Court of Appeal of Louisiana, Fifth Circuit.
March 25, 2003.
*201 Margaret M. Sollars, Louisiana Appellate Project, Thibodaux, LA, for Ryan Watson, Defendant-Appellant.
Paul D. Connick, Jr., District Attorney, Parish of Jefferson, State of Louisiana, Alan D. Alario, II, Terry M. Boudreaux, Assistant District Attorneys, Gretna, LA, for the State of Louisiana, Plaintiff-Appellee.
Panel Composed of Judges SOL GOTHARD, JAMES L. CANNELLA and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
Ryan Watson appeals his conviction of two counts of aggravated rape and one count of armed robbery, as well as the resulting sentences that incarcerate him for two consecutive life terms followed by a total of 111 years. We affirm, but remand for correction of a patent error.
On September 20, 2001 Ryan Watson was indicted on three counts of aggravated rape (La.R.S. 14:42) and two counts of armed robbery (La.R.S. 14:64).[1] He entered a plea of not guilty and filed several pre-trial motions, including motions to suppress his statements, identification and evidence. Following a hearing, all the motions were denied.[2]
After a two-day jury trial, the defendant was found guilty as charged on two of the three aggravated rape counts (Counts One and Three) and on one of the armed robbery counts (Count Two). The defendant was found guilty of the lesser offense of simple robbery on the second armed robbery count (Count Five).
The defendant was sentenced to life imprisonment for each of the two aggravated rape convictions, 99 years for the armed robbery conviction, with an additional five years for the use of a firearm, and seven years for the simple robbery conviction. His sentences were ordered to run consecutively.
Defendant appeals his convictions and sentences.

FACTS
Counts One and Two
In Counts One and Two, the defendant was charged with the aggravated rape and armed robbery of E.W.[3] E.W. testified that on July 4, 2001, she left her house in Marrero at approximately 5:20 a.m. to *202 catch the bus for work. On her way to the bus stop, E.W. passed the defendant, who was walking in the opposite direction. E.W. said, "Good morning," to the defendant and he responded. Three seconds later, someone rushed E.W. from behind and told her to be quiet. She looked down to her right and saw a chrome gun barrel. She assumed then it was the man she had just passed on the sidewalk, because there was no one else around and no one else had passed.
The assailant forced her between two buildings, where he frisked her and took money from her pockets. He then told her to go to a grassy area, where he told her to pull her pants down below her knees. E.W. complied and the assailant vaginally raped her from the rear. The attacker then threw a black shirt onto the ground and told E.W. to lie on it. He took off the white shirt he was wearing and placed it over E.W.'s head. He forced her to perform oral sex on him and then he vaginally raped her a second time.
Before leaving, he gave her money for bus fare and told her to count from one to 20 and again from one to 50. She thought he was watching her and would follow her if she went home, so she boarded the bus and went to work. When she arrived at work, E.W. called her father and told him she had been robbed. She did not tell her father about the rape because she was scared he would go looking for the rapist.
E.W.'s father called the police, who then contacted E.W. at work. E.W. initially told the police she had only been robbed. She did not disclose that she had been raped until the police called her a second time. Police officers then went to E.W.'s place of employment and took her statement, after which they took her to the hospital. She was examined by Dr. Neil Wolfson, who testified the examination revealed evidence of sexual trauma consistent with rape.
After being shown a photographic lineup by police, E.W. identified the defendant as her attacker. At trial she pointed out the defendant as the person who robbed and raped her.
E.W. also testified that the defendant has a girlfriend named Latasha. E.W. said that in the period between the date of the attack and the trial, Latasha talked to her at Wal-Mart and asked questions about the incident. E.W. said she felt "it was none of her business" and just told Latasha that the defendant had robbed her.
On cross-examination E.W. said she was able to see the perpetrator clearly. She said his hair was twisted, he "didn't have that much facial hair," and he wasn't darkskinned, but a brown-skinned color. She identified a sketch made by a police artist from her description at the time. She insisted that it reflected the defendant's appearance at the time. E.W. also admitted that in speaking to one of the investigating officers (Detective Clogher) she denied that the perpetrator had made her perform oral sex. She said she left out the parts she "didn't feel comfortable with." She also admitted that in her conversation with the defendant's girlfriend, Latasha, she denied that she had been raped "because it wasn't her business."
Counts Four and Five
In Counts Four and Five the defendant was charged with the aggravated rape and armed robbery of D.L.
On July 20, 2001 (approximately two weeks after the attack and robbery of E.W.), D.L. was leaving her apartment at 3:00 a.m. and walking toward her car when she saw someone walking. She turned around, preparing to return to her apartment, and someone jumped her from behind. *203 She glanced around and saw a silver or chrome gun aimed at her head. She thought someone was playing a joke on her and turned; he told her to turn her head back around. The assailant made her go inside her apartment. He asked her who was in the house and they went upstairs. He demanded money; she told him it was in her bible, which was upstairs. In fact, she did not have money in the bible, but in an I.D. case she had on her. The perpetrator made D.L. give him her money, which she said was over $500. D.L. testified he then raped her and told her if she called the police he was going to come back for her and her child.
D.L. said she "balled up in a corner and cried" for a while after the incident, then called a friend who stayed with her while she called the police and was interviewed. D.L. later identified the defendant from a photographic lineup shown her by the police and also pointed him out in court.
Count Three
In Count Three the defendant was charged with aggravated rape of B.J., who was 14 years old at the time. B.J. testified that at approximately 7:00 a.m. on July 20, 2001 (the morning of the incident involving D.L.) she was walking to school for summer classes. She saw a man coming up along the sidewalk as she entered the parking lot. She noticed the man went all the way round the apartment building, then stood near a door at the end as if waiting for her to pass. B.J. was suspicious and walked by the man with her head down. After B.J. passed him, she heard him coming up behind her. He put a black shirt over her face, told her to be quiet and asked whether she had any money. She felt a gun against her side. She told him no, but he took her purse from her.
He brought her along the side of the apartment building and patted her down, like a police officer would search a suspect. He then forced B.J. to lie down in the grass on top of her purse. B.J. told the assailant she was still a virgin and begged him to let her go. He responded by pulling her underwear down and vaginally raping her. Then he left, at which time B.J. put her underwear back on and ran across the street to the school, where she reported the rape to a police officer.
B.J. was unable to describe her assailant's face, but was able to describe his clothing and shoes. Her description of her assailant's apparel matched the description of a man seen lurking around the same apartment complex later that morning by another schoolgirl, Ebony Vaughn, who said she felt that person was following her as she walked to school. She was able to get away by joining a group of boys from her school; she later reported the incident to her mother, who called the police. Police subsequently showed Ebony a photographic lineup from which she identified the defendant as the person who was following her.
D.L., B.J., and Ebony Vaughn all lived in the Concordia Apartment complex.
Ryan Watson was arrested at his girlfriend's home at approximately 2:30 a.m. on July 21, 2001. He gave two statements to the police, admitting his involvement in the rape and robbery of E.W. and the rape of B.J. He admitted having sexual intercourse with D.L., but stated that D.L. offered to have sex with him. He further admitted taking money from D.L.
Lieutenant Gray Thurman of the Jefferson Parish Sheriff's Office testified that he assisted Lieutenant Maggie Pernia in interviewing the defendant, Ryan Watson, on June 21, 2001. The defendant gave him information that implicated him in the sexual acts involving these three victims. Thurman then took two taped statements *204 from the defendant. In addition, Thurman accompanied the defendant to look for the gun used during the attacks, which the defendant claimed he had thrown away. After going to two sites that were false leads, officers eventually found the gun in some bushes near the front door of the defendant's girlfriend's apartment.
Lieutenant Thurman testified that when he questioned the defendant, the defendant did not appear to be under the influence of alcohol or drugs.
The defendant's case consisted of testimony by an alibi witness, Travis Roussell, as well as the defendant's own testimony. Roussell testified that in July 2001 he and his girlfriend, Shawanda Dabney, were living with Latasha Dabney, Shawanda's sister. Roussell said that on the morning of July 20, 2001 he took Shawanda to her job at McDonald's at about 4:25 a.m. He then returned to Latasha's home. Roussell said that the defendant was there with Latasha and their children. As Roussell returned to the house about 5:15 a.m., he saw the defendant coming downstairs to take Latasha to work. He saw the defendant return from taking Latasha to work around 6:45 a.m. According to Roussell, the defendant was there babysitting his children until about 1:30 p.m., when Shawanda returned home and the defendant left.
Ryan Watson testified on his own behalf. He said that on July 20, 2001, at 3:00 a.m. he was passing the Concordia Apartments and was on his way home. He stopped when he saw D.L., who was standing in front of a row of cars, "like she was waiting for somebody to come." The defendant said that D.L. greeted him and he asked what she was doing outside that time of night.
According to the defendant, D.L. told him she was waiting for somebody to bring her some cocaine. He further said she told him that people call her a whore; then she asked him to go inside with her. He went into her house with her and "from there, it happened." Asked whether she indicated to him that she wanted to engage in sex, he said "she had no problem with it." He also said she gave him a condom out of a drawer in her kitchen, then they had sex in the living room. He stated he got up and left after that.
Watson said he then went to 6742 Mathers St. (Latasha Dabney's home) and that he arrived around 3:35 or 3:40 in the morning. He lay down and slept until time to take Latasha to work, around 5:15 a.m. He walked her to her job at McDonald's on Ames Boulevard, then returned to her house on foot around 6:45 or 7:00 a.m. He went back to watch the children. The defendant stated he remained on the premises until 1:30, when he went to a recording studio on the West Bank Expressway after Shawanda returned home to watch the children.
At trial the defendant denied that he raped B.J. He admitted seeing Ebony Vaughn when he was throwing trash away, but denied he either followed her or attempted to accost her. He said he could not leave the children unattended. The defendant also denied that he had twisted hair on July 4, 2001, the day E.W. was raped, and stated he had a moustache and goatee on that day. He said he has never had twisted hair or a "Ricky Williams" look.
The defendant testified that he returned to Latasha's house early on the morning of July 21, 2001. Prior to going there, however, he and two friends had been drinking liquor ("about a fifth") and smoking marijuana ("two or three blunts [marijuana cigars]"). He arrived at Latasha's home around 2:15 and laid down. There was a knock on the door and several policemen came in and arrested him. He was taken *205 to the detective bureau wearing only socks, boxer shorts, and a shirt. He arrived about 2:45. Lieutenant Thurman and Lieutenant Pernia questioned him. According to the defendant, he was not "fully intoxicated," but he was feeling the effects of his alcohol and marijuana consumption and his ability to make decisions was impaired. The defendant stated that Thurman told him that three women had pointed him out as having raped and robbed them.
The defendant denied at trial that he had rape any of the three women or that he had robbed any of them. He testified that the statements he gave to the police were what he was told to say.
On cross examination, he testified that on July 4, 2001, he was at his mother's house, not at his girlfriend's house, that he was sleeping until 7:00 in the morning, and was with his family the rest of the day.
On appeal the defendant raises the following assignments of error:
1. The Trial Court erred by failing to suppress the defendant's statements.
2. The Trial Court erred by failing to allow a defense witness to testify after she heard some of the testimony.
3. The evidence was insufficient to support some of these convictions.
4. The Trial Court erred by ordering that all of the sentences be made consecutive to a life sentence already imposed.
We address these in order of importance.

ASSIGNMENT OF ERROR NUMBER THREE
The evidence was insufficient to support some of these convictions.
The defendant challenges the sufficiency of the evidence relating to both his aggravated rape convictions and his armed robbery conviction. First, he argues that E.W.'s identification of him as the perpetrator of her rape and robbery was insufficient. He asserts his physical appearance does not match the description of the perpetrator E.W. gave the police.
Second, the defendant claims the State failed to prove the aggravated nature of the rape of B.J. because the evidence did not show he was armed or that the victim resisted to the utmost. He does not challenge the sufficiency of the evidence relating to his simple robbery conviction.
When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992).
The constitutional standard for testing the sufficiency of the evidence requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).
A reviewing court is required to consider the whole record and determine whether a rational trier of fact could have found defendant guilty beyond a reasonable doubt. State v. Hubbard, 97-916, p. 10 (La.App. 5 Cir. 1/27/98), 708 So.2d 1099, 1103, writ denied, 98-0643 (La.8/28/98), 723 So.2d 415.
In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the identity of the perpetrator. State v. Vasquez, *206 98-898, p. 6 (La.App. 5 Cir. 2/10/99), 729 So.2d 65, 69. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Vasquez, 98-898 at p. 7, 729 So.2d at 69.
Sufficiency of Identification by E.W.
The defendant does not argue that the State failed to establish any of the essential statutory elements of his convictions for the aggravated rape and armed robbery of E.W. Rather, the defendant contends the State failed to prove beyond a reasonable doubt his identity as the offender.
After the incident, E.W. gave a description of her attacker to the police, from which the police compiled a composite sketch. E.W. described her attacker as being five feet six inches, 150 pounds, brown-skinned as opposed to dark-skinned, and having "twisted" head hair and no facial hair.
Approximately two weeks after the incident, E.W. was shown a photographic lineup, from which she identified the defendant as the perpetrator. The photographic lineup showed the defendant with a short haircut, a moustache and a minimal goatee. At trial, E.W. identified defendant in court as the person who raped and robbed her.
The defendant asserts he did not match E.W.'s initial description of the perpetrator. He points specifically to that part of E.W.'s description where she described her attacker as having "twisted" hair and no facial hair. The defendant contends he never wore his hair "twisted" and asserts he wore a moustache and goatee. He further questions E.W.'s credibility because she initially did not tell her father or the police about the rape; when initially questioned by the police she specifically denied the defendant forced her to perform oral sex; and she told the defendant's girlfriend only about the robbery and not about the rape. As evidence of the misidentification, the defendant relies on his alibi that he was home with his family at the time of the rape and robbery.
During trial, E.W. was fully cross-examined about the description she gave the police. She was also questioned about her initial failure to report the rape. E.W. explained she did not tell her father because she was scared he would go looking for the rapist and she did not tell the police because she was scared. E.W. also explained she did not feel comfortable talking about the oral sex aspect of the rape so she initially denied it. She subsequently told the police about the oral sex one hour later.
The jury heard all the evidence and obviously found E.W. to be credible and chose to believe her testimony over that of the alibi witness, Travis Roussell, and the defendants trial testimony.
The credibility of a witness is within the sound discretion of the trier of fact. State v. Hotoph, 99-243, p. 12 (La. App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045, writs denied, 99-3477 (La.6/30/00), 765 So.2d 1062, and 00-0150 (La.6/30/00), 765 So.2d 1066. It is not the function of the appellate court to assess credibility or reweigh the evidence. Id.
We analogize the facts in this case to those in State v. Williams, 97-2382 (La. App. 4 Cir. 4/21/99), 738 So.2d 598, 601, writ denied, 99-1415 (La.10/15/99), 748 So.2d 466, and State v. Isaacs, 95-173 (La. App. 5 Cir. 6/28/95), 658 So.2d 29, 33, writ denied, 95-1948 (La.1/5/96), 666 So.2d 299. In both those cases the courts upheld jury findings that found the victims testimony credible despite variations from the victims initial descriptions.
*207 Here, there is minimal discrepancy between E.W.'s initial description and the defendant's actual appearance. Hairstyles and facial hair are something easily and often changed. There was no evidence presented as to when the photographic lineup was prepared or when the picture of the defendant used in the lineup was taken.[4] The defendant easily could have changed his appearance after the July 4, 2001 rape of E.W. by cutting his hair and letting facial hair grow.
Despite the minor discrepancy between E.W.'s description and the defendant's actual appearance, E.W. identified the defendant as the perpetrator from a photographic lineup two weeks after the incident and made an in-court identification of him at trial. The jury obviously chose to believe her testimony establishing Ryan Watson as the person who raped and robbed her. Further, the jury heard the defendant admit he raped E.W. in his taped statement.
Thus, viewing the evidence in the light most favorable to the prosecution, it appears that a rational trier of fact could find, beyond a reasonable doubt, that defendant was the perpetrator of the crime.
Sufficiency of Evidence for Aggravated Rape of B.J.
The defendant claims the evidence in the rape of B.J. only supports a conviction for forcible rape as opposed to aggravated rape, because there was no evidence that the defendant was armed with a gun during the rape or that the victim resisted to the utmost.
La.R.S. 14:42 defines aggravated rape in pertinent part as follows:
A. Aggravated rape is a rape committed... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
B.J., who was only 14 years old at the time of the rape, testified that the defendant held a weapon to her right side when he came up behind her and led her to the side of the apartment building. She did not actually see the weapon, but said it felt like a gun. On cross-examination she admitted the defendant did not tell her he had a gun, but she was certain it was a gun because she felt it with her elbow. B.J. stated the defendant pushed her forcibly to the ground, pulled down her underwear, and vaginally penetrated her. She also stated that she tried to get the defendant off of her by scooting away from him but she was unsuccessful.
The testimony of the victim alone can be sufficient to establish the elements of a sexual offense. Hotoph, 99-243 at p. 13, 750 So.2d at 1045. As previously stated, the credibility of a witness, including the victim, is within the discretion of the trier of fact. Id.
B.J.'s testimony alone established all the elements of the offense of aggravated rape. According to her testimony, the defendant forced her to have sexual intercourse *208 and he was armed with a gun. The unanimous guilty verdict returned on this count indicates that the jury found the victim's testimony credible. Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant committed aggravated rape on B.J.
We find no merit to Assignment of Error No. 3.

ASSIGNMENT OF ERROR NUMBER ONE
The Trial Court erred by failing to suppress the defendant's statements.
The defendant argues that his two inculpatory statements should have been suppressed because they were not voluntary. He asserts he was under the influence of drugs and alcohol to such a degree that it rendered his statements involuntary. He contends his intoxication diminished his capacity to understand his rights and, therefore, he did not validly waive his rights.
The record indicates the defendant filed a motion to suppress his two statements prior to trial, although it does not contain the written motion. After a hearing, the trial court denied the motion to suppress as to each statement.[5] In denying the motion, the trial court noted:
I have been confused since Mr. Watson's testimony as to how he could have remembered all the facts that he gave in the statement when he was as intoxicated and [as] full of drugs as he would have suggested he was.
I have a hard time with that concept. It's a fifty someseventeen page statement, whatever it is. When somebody says he's so intoxicated he doesn't know what's going on, but he's given detail after detail that you would argue that he picked up from officers; those two don't go together well for me, that concept of being so intoxicated, but at the same time, you could give a seventeen page statement full of details.
Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda[6] rights and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement or promises. La.R.S. 15:451; State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, 29, cert. denied. 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998).
A determination of voluntariness is made on a case-by-case basis, depending on the facts and circumstances of each situation. State v. Quest, 00-205, p. 9 (La.App. 5 Cir. 10/18/00), 772 So.2d 772, 780, writ denied, 00-3137 (La.11/2/01), 800 So.2d 866. The admissibility of a confession or statement is a determination for the trial judge and his conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. Id.
Intoxication renders a confession involuntary when the intoxication is of such a degree as to negate the defendants comprehension and to make him unconscious of the consequences of what he is saying. Quest, 00-205 at p. 9, 772 So.2d at 780. Whether intoxication exists and is of *209 a degree sufficient to vitiate the voluntariness of the confession are questions of fact; a trial judge's conclusions on this issue will not be disturbed unless unsupported by the evidence. Id.
The defendant's first statement was taken by Lieutenants Thurman and Pernia approximately two hours after his arrest. Prior to giving the statement, the defendant executed a Waiver of Rights form, in which he indicated that he had read and understood his rights and that he wished to waive his rights and give a statement. Lieutenant Thurman testified at the suppression hearing that he read the rights aloud to the defendant and that the defendant indicated he wished to waive his rights, as evidenced by the defendant's signatures on the rights of arrestee form. There was no doubt in Thurman's mind that defendant understood his rights. Thurman again advised defendant of his rights at the beginning of both taped statements. In addition, Thurman testified no one threatened defendant or promised him anything in exchange for the statement.
The defendant also testified at the suppression hearing. He stated he had been drinking and smoking marijuana prior to his arrest and was not in his "right state of mind" at the time he gave his statements. He explained that at approximately 11:00 p.m., he and two friends drank some whiskey and smoked a few "blunts."[7] He then walked 45 minutes to his girlfriend's house and was in bed when the police arrived.
The defendant admitted that Lieutenant Thurman went over his rights at the detective bureau, but the defendant claimed he did not understand any of it. The defendant testified he was never asked if he was intoxicated, but he admitted that during the taped statement he never stated he was drunk. At trial, the defendant testified he dozed off several times during his statements because he was tired and suffering the effects of intoxication.
Lieutenant Maggie Pernia testified at the hearing on rebuttal that nothing indicated the defendant was intoxicated at the time of his statement. She stated the defendant appeared to have all his faculties about him and appeared to understand what was transpiring.
The voluntariness of the defendant's statement turns on the credibility of the witnesses. Lieutenant Pernia testified there was nothing to indicate he was intoxicated. In addition, as noted by the trial court, the defendant was capable of logically answering questions and providing details of the offenses for approximately 25 minutes in his first statement, given from 4:52 to 5:15 a.m., and for another ten minutes in his second statement, given from 5:17 to 5:27 a.m.
Although the defendant claimed at trial he dozed off during his statements from the effects of the intoxication, he did not offer this testimony at the suppression hearing and there is nothing in the statements themselves that suggests the defendant fell asleep during the relatively short statements.
Based on the above, the trial court did not abuse its discretion in denying the motion to suppress. We find no merit to this assignment of error. See State v. Watts, 98-1073 (La.App. 5 Cir. 5/19/99), 735 So.2d 866, 871, and State v. Marshall, *210 98-486 (La.App. 5 Cir. 2/23/99), 729 So.2d 101, 103.

ASSIGNMENT OF ERROR NUMBER TWO
The Trial Court erred by failing to allow a defense witness to testify after she heard some of the testimony.
The defendant asserts he was denied the right to present a defense when the trial judge refused to allow the testimony of Latasha Dabney after she violated the sequestration order.[8]
At the outset of trial, the State requested and obtained a sequestration of all witnesses. After the defendant testified, defense counsel sought to call Latasha Dabney. The State objected on the ground that Dabney had been sitting in the courtroom. Defense counsel responded that Dabney had been sequestered for most of the trial, but came into the courtroom after counsel informed her that he did not need her testimony. Defense counsel explained that in light of the State's cross-examination of the defendant and its focus on certain evidence, he was compelled to call Dabney. He requested permission to do so despite the violation of the sequestration order.
The trial court denied the request, stating:
No. A sequestered witness who was then brought back into the courtroom during the defendant's cross-examination, we would then let her testify, in order to buttress his alibi? It would totally emasculate the concept of sequestration.
The fact that the State opted to question the lack of testimony by defense volunteered alibi witnesses, I don't think should be used against the State as a reason to allow sequestered witnesses, who then come back into the courtroom, on their own, I suppose, with the blessing of defense counsel. I don't think that's an exception to the sequestration rule.
Defense counsel objected to the trial court's ruling and then rested his case.
Sequestration of witnesses is governed by La.C.E. art. 615. That article provides that on request of a party the court shall order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case.
The purpose of the sequestration rule is to prevent witnesses from being influenced by the testimony of earlier witnesses and to strengthen the role of cross-examination in developing the facts. State v. Reyes, 98-424, p. 13 (La.App. 5 Cir. 12/29/98), 726 So.2d 84, 91, writ denied, 99-1474 (La.10/8/99), 750 So.2d 967. When an order of sequestration is violated, the trial court has discretion in imposing sanctions including disqualification of the witness. La.C.E. art. 615(B); Reyes, 98-424 at p. 13, 726 So.2d at 91. The trial court's discretion regarding sanctions will not be disturbed on appeal absent a clear abuse of that discretion. Id.
However, there are constitutional limitations on the trial court's exercise of its discretion. State v. Warren, 437 So.2d 836, 839 (La.1983). The Sixth Amendment *211 to the United States Constitution and Article 1, § 16 of the Louisiana Constitution guarantee an accused the right to compel the attendance of witnesses and to present a defense. When the trial court excludes a defense witness for the violation of a sequestration order, the defendant's constitutional rights may be impaired. State v. Armstead, 432 So.2d 837, 842 (La.1983).
In State v. Jones, 354 So.2d 530, 532 (La.1978), the Louisiana Supreme Court explained:
Although our jurisprudence allowing trial judges to enforce sequestration pursuant to La.C.Cr.P. art. 764 by excluding testimony of disobedient witnesses does reflect a legitimate state interest in preventing testimonial influence that interest is not sufficient to override the defendant's rights to have compulsory process and to present a defense under either the federal or the state constitution.
The exclusion of a witness is a disfavored sanction, absent a showing that the sequestration violation occurred with the consent, connivance, procurement or knowledge of the party or his counsel for whom the witness was to testify. Warren, 437 So.2d at 840.
In the present case, the trial court excluded the testimony of Latasha Dabney because she had been present during the testimony of the defendant. Her presence in the courtroom was known to defense counsel, who had previously advised Dabney he would not need her testimony. Because the violation of the sequestration order occurred with the consent and knowledge of defense counsel, the exclusion of Dabney's testimony was within the trial court's discretion.
Further, defense counsel never stated on the record the substance of Dabney's testimony and never proffered her testimony pursuant to La.C.E. art. 103.[9] Therefore, the record does not reflect whether Dabney was in a position to offer testimony that might have substantially helped the defense[10] and the defendant failed to preserve the excluded testimony for appeal by failing to proffer the evidence. See, State v. Searcy, 621 So.2d 83, 87-88 (La.App. 2 Cir. 6/23/93).[11]
We conclude the trial court did not abuse its discretion in excluding Dabney's testimony after she violated the sequestration order.

ASSIGNMENT OF ERROR NUMBER FOUR
The Trial Court erred by ordering that all of the sentences be made consecutive to a life sentence already imposed.
The defendant argues that the consecutive nature of his sentences on Counts Two, Three and Five to his life *212 sentence on Count One is excessive. He asserts that a sentence beyond natural life makes no contribution to acceptable goals of punishment and, thus, is excessive.
The defendant failed to file a written motion to reconsider as required by La. C.Cr.P. art. 881.1. Although the defendant made an oral objection at the time of sentencing, the objection was not specific enough to satisfy the requirements of Art. 881.1. Defense counsel merely stated, "Your Honor, please note our objection to the sentence." The defendant never specifically objected to the consecutive nature of the sentences or even to the excessiveness of the sentences.
The failure to file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for constitutional excessiveness. State v. Hester, 99-426, p. 10 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 103, writ denied, State v. Patterson, 99-3217 (La.4/20/00), 760 So.2d 342.
The defendant does not contend that any sentence on its own is excessive. Rather, he urges that the consecutive nature of his sentences make them excessive. This Court has recognized that the excessiveness of a consecutive sentence is not included in a bare constitutional review. State v. Christoff, 00-1823, p. 11 (La.App. 5 Cir. 5/30/01), 788 So.2d 660, 666. Accordingly, we shall not review the defendant's consecutive sentences as excessive.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We note the commitment indicates the defendant was convicted of armed robbery on Count Five, while the transcript shows he was convicted of the lesser charge of simple robbery. Where there is a discrepancy between the commitment and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). Thus, we remand in order for the trial court to amend the commitment to properly reflect the conviction on Count Five.
We also note that the defendant received an illegally lenient sentence on Count Two, in that the trial court failed to make the additional five-year sentence for use of a firearm in the armed robbery run consecutively to his 99 year sentence, as mandated by La.R.S. 14:64.3. However, this error is inconsequential because the defendant is serving a life sentence.
For the foregoing reasons, the defendant's convictions and sentences are affirmed. The matter is remanded and the trial court is ordered to amend the commitment to reflect correctly the conviction on Count Five.
AFFIRMED AND REMANDED WITH ORDER.
NOTES
[1] The aggravated rape charges were Counts One, Three and Four; the armed robbery charges were Counts Two and Five.
[2] The defendant's written motions to suppress evidence and his statements are not contained in the record, which contains only his motion to suppress identification.
[3] As provided by La.R.S. 46:1844(W), the sex crime victims are identified by their initials.
[4] In questioning E.W. on redirect, the prosecutor referred to the photograph of defendant in the lineup as being taken at the time of defendant's arrest on July 20, 2001. However, there was no testimony establishing that fact.
[5] The hearing pertained to nine separate motions to suppress filed by defendant.
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[7] In reviewing the trial court's ruling on a motion to suppress, this Court may consider evidence presented at the motion hearing as well as at trial. State v. Taylor, 99-1154 (La. App. 5 Cir. 2/29/00), 757 So.2d 63, writ denied, 00-1021 (La.3/30/01), 788 So.2d 441. At the motion hearing the defendant testified he drank a gallon of whiskey. At trial, however, he testified it was a fifth of liquor.
[8] The State erroneously responds that the defendant presented Dabney's testimony earlier in the trial and, therefore, the defendant was not limited in his ability to present a defense. The State asserts the trial court did not abuse its discretion in refusing to allow defendant to recall Dabney. However, the record shows Dabney never testified at trial, but only at a pretrial motion hearing.
[9] La.C.E. art. 103 provides that an "error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... when the substance of the evidence was made know to the court by counsel."
[10] Dabney's testimony during the suppression hearing was limited solely to her consent to allow the police to search her apartment after the defendant's arrest. Therefore, it provides no insight into information she may have had to assist the defense.
[11] In Searcy, the second circuit found that error could not be predicated upon the trial court's ruling excluding the testimony of a defense witness who had violated the sequestration order where defense counsel failed to proffer the excluded testimony. The court reasoned it could not determine the effect of the witness's testimony without any indication of the substance of the testimony. The court initially determined the exclusion of the witness's testimony was constitutionally impermissible, but ultimately concluded the error was harmless because of the lack of a proffer.