729 So.2d 65 (1999)
STATE of Louisiana
v.
Terry VASQUEZ.
No. 98-KA-898.
Court of Appeal of Louisiana, Fifth Circuit.
February 10, 1999.
*66 Paul D. Connick, Jr., District Attorney, Ellen S. Fantaci, Terry M. Boudreaux, Vincent Paciera, Jr., Assistant District Attorneys, Gretna, Louisiana, Attorneys for Appellee.
Sandra C. Jenkins, Louisiana Appellate Project, New Orleans, Louisiana, Attorney for Appellant.
Panel composed of Judges CHARLES GRISBAUM, EDWARD A. DUFRESNE, Jr. and SUSAN M. CHEHARDY.
CHEHARDY, Judge.
Terry Vasquez appeals his conviction of second degree murder. We affirm, for the reasons that follow.
On December 14, 1995 Terry Vasquez was indicted for the first degree murder of Tyrone Shropshire, a violation of LSA-R.S. 14:30. Edwin Codrington (a/k/a Edwin Cedrington)[1] and Edward Johnson were charged as co-defendants. Vasquez was arraigned on December 27, 1995 and entered a plea of not guilty. Vasquez filed a motion to suppress confession, identification and physical evidence, which was denied. Pursuant to the defendant's motion to appoint a sanity commission, the court held a sanity hearing and found him competent to stand trial.[2]
On March 21, 1997, the State amended the bill of information, reducing the charge to second degree murder (LSA-R.S.14:30.1) as to all defendants. Vasquez was tried together with Codrington and Johnson in a four-day trial. On September 19, 1997, the jury returned a verdict of guilty as charged as to all defendants.
On October 2, 1997 Vasquez was sentenced to a mandatory term of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. He made an oral motion for appeal and filed a written motion for appeal on April 13, 1998.[3]

FACTS
On November 11, 1995, at about 7:00 p.m., several people were gathered at the Pierre home at 1145 Tallowtree Lane, Apartment A, in Harvey. Maxine Pierre and her husband, Aaron Pierre, Sr., had just returned home from grocery shopping. Mr. Pierre put away groceries, then went outside to put out the trash. Mrs. Pierre went to an upstairs bedroom. Mrs. Pierre's son, seventeen-year-old Tyrone Shropshire (also referred to as "Tyson" or "Tysie"), was in the living room *67 playing cards with his brother, Aaron Pierre, Jr. With them were Lance Washington (a/k/a Lance Temple) and other friends, identified as Hilton, Flowers, and Allan. The Pierres' eleven-year-old daughter, Erica, was sitting on the staircase near the kitchen door with Ebony Mills and five-year-old Kevin Simmons.
Aaron Pierre, Sr. went back into the house through the front door. At the same time, Tyrone was attempting to bar the sliding glass door in the kitchen using a wooden stick. Terry Vasquez, wearing a red bandanna and a hooded jacket to conceal his face, forced his way in through the kitchen door. Tyrone ran up the stairs and Vasquez followed, carrying a twelve-gauge shotgun. As he passed Kevin, Vasquez hit the boy in the head with the butt of the gun. Mr. Pierre ran up the staircase after Vasquez. Kevin Simmons, Lance Washington, and each of the Pierres testified that they heard a single gunshot.
Mrs. Pierre opened the bedroom door and the gunman pointed his gun at her and said, "Give it up, bitch." Mr. Pierre jumped on the man and struggled with him as Mrs. Pierre hid inside a closet. Edward Johnson and Edwin Codrington entered the house by way of the sliding door. They also wore red bandannas, a signature trait of the 5.9 Bloods gang. They went upstairs and joined in the attack on Mr. Pierre. As the perpetrators left, one of them told the Pierres, "I got your baby."
Erica testified that after she heard the gunshot, she saw Johnson and Codrington enter by way of the kitchen door. Kevin and Ebony fled the house and went to a nearby candy store to call for help. Aaron Pierre, Jr. heard the fighting and hid in a downstairs closet in the stairwell. The door was ajar and he saw Codrington, Johnson and Vasquez run down the stairs. Johnson and Vasquez took off their bandannas and all three men left through the kitchen door. Washington exited through the front door upon hearing the gunshot. He went with the children to the candy shop, where he called police.
Aaron, Jr. and Erica testified that they saw all three perpetrators, and that they knew the men from the neighborhood. Kevin testified that he saw only Vasquez enter the house, but that he saw Johnson standing outside the back door. Kevin stated he knew the men prior to the murder. Mr. and Mrs. Pierre, Sr. were unable to identify any of the perpetrators.
Deputy Wayne Heims of the Jefferson Parish Sheriff's Office testified that he received a call at 7:34 p.m. about an illegal discharge of a weapon at 1145 Tallowtree, Apartment A. He responded to the call within minutes and found fifty or sixty people outside the building. Heims entered the house through the front door and was directed upstairs by a distraught Mrs. Pierre. She led the officer to a bedroom, where Tyrone Shropshire's body lay in a large pool of blood. A window in the room was open, leading Heims to infer that the victim had tried to escape. The deputy radioed to headquarters for backup officers.
Homicide Detective Norbert "Jeff" Gurtner was notified of the murder at 8:14 p.m. on November 11. He was appointed the case officer (chief investigator) in the matter. He immediately separated all known witnesses and had them transported to the detective bureau for questioning. While at the scene, Gurtner determined there were three perpetrators. He was given the names of "Bolo" (Edwin Codrington) and "T-Bone" (Terry Vasquez). During further interviews at the detective bureau, Detective Gurtner arrived at the name of Johnson as the third perpetrator.
Dr. Fraser MacKenzie, a forensic pathologist, performed an autopsy on Tyrone Shropshire's body. MacKenzie testified that the victim died of a gunshot wound to the chest which hit both lungs and cut the aorta in half. The doctor recovered a deformed lead pellet from the body. MacKenzie testified that he found traces of cocaine and marijuana in the victim's urine, but that the drugs did not contribute to his death.
Deputy Michael Kuzma of the crime scene division took photographs and collected evidence at the scene. Among the items he found near the body were a spent Winchester twelve-gauge shotgun shell, a Federal *68 twelve-gauge live shotgun shell, and several pieces of cardboard wadding.
On the night of the murder, Detective Gurtner showed a photographic lineup to several witnesses individually. Aaron Pierre, Jr., Erica Pierre and Lance Washington all identified Terry Vasquez as one of the perpetrators. Kevin Simmons viewed the lineup on June 21, 1996 and also identified Vasquez. On November 12, 1995 Gurtner showed witnesses a book of photographs. From that book Aaron Pierre, Jr. and Erica Pierre identified Johnson and Codrington as perpetrators. On June 21, 1996 Kevin Simmons was shown the book and also identified Johnson as one of the perpetrators.
Detective Gurtner applied for and obtained arrest warrants for Johnson, Vasquez and Codrington. On November 12, 1995 Gurtner went to the home of Codrington's parents, where police believed Codrington was residing. When Codrington's mother answered the door, she informed them that he was on the premises. The detective explained that he did not have a search warrant, but asked whether she would consent to a search of the residence. She gave her consent and completed a Consent to Search form.
Gurtner recovered three red bandannas on the premises. Police also seized khaki work pants and a khaki shirt that resembled clothing described by witnesses. Gurtner advised Codrington of his Miranda rights and Codrington waived those rights. In response to questioning, Codrington stated he had bought a twelve-gauge shotgun the day of the murder. He produced a receipt for the gun dated November 11, 1995.
Codrington directed officers to 1040 Tallowtree Lane, the apartment of one Roy Kennedy, where the gun was recovered. Lieutenant Buras immediately unloaded the weapon, removing three live rounds. One round was Winchester brand and the other two were Federal high power number six shot. Detective Gurtner testified that the type of ammunition recovered at the scene was identical to that found in the weapon. Gurtner also found a box of Federal high power number six twelve-gauge shotgun shells.[4]
Codrington made a tape recorded statement to Gurtner on November 12.[5] Codrington disclosed that he is a member of the 5.9 Bloods gang and that the gang's members hang out in Harvey. He had known the victim for about a year. He bought a shotgun on the day of the murder because he wanted to protect himself against other gang members. He noted that his friend T-Bone (Vasquez) had been shot the previous night, purportedly by a rival gang. Codrington said that he dropped his gun off at Terry's house, then went to a Wal-Mart store and bought a box of twelve-gauge number six buck shot. He dropped the bullets off at Terry's house and went for a ride in a friend's car. He returned home at about 8:50 p.m. to prepare for work. He was later alerted to the fact that he was wanted by police and called the sheriff's office to determine whether that was the case.
On November 12, Detective Gurtner was informed that Terry Vasquez was at the Jefferson Parish Correctional Center and was inquiring as to whether he was wanted for Tyson Shropshire's murder. Gurtner placed Vasquez under arrest that day and advised him of his rights. Vasquez signed a waiver of rights form and agreed to make a recorded statement.
In response to Gurtner's questions, Vasquez said that he had been shot at 11:30 on the night of November 10. He was taken to Charity Hospital in New Orleans and was released after seven or eight hours. His aunt picked him up from the hospital and drove him to the home of his uncle, Peter Colon-Vasquez. He slept there until about *69 5:00 or 6:00 p.m. on November 11. Several relatives spent the evening visiting with him. He stayed up until 9:00 p.m., then went to sleep. He woke up at noon on November 12. Vasquez said he had last seen Codrington at about 8:00 p.m. on November 10. He stated he had not seen Johnson in two or three days. Vasquez admitted to being a member of the 5.9 Bloods, but said Tyson was not a member. He said he would not have shot Tyson, because he had known the victim and his family for five years.
On November 13, 1995, Vasquez asked to make another statement. Gurtner again advised him of his rights and he completed another waiver of rights form. Defendant stated he had received information that two men known to him as Kalie and Jimal were involved in the murder. Both of Vasquez's statements were played for the jury at trial. Detective Gurtner testified that witnesses were shown a photograph containing a picture of Jeremiah Delamore ("Kalie"), but that none of the witnesses identified Delamore as one of the perpetrators.
Edward Johnson turned himself in at the detective bureau on November 14, 1998 after he saw a newscast in which he was named as a suspect in the Shropshire murder. Detective Gurtner placed Johnson under arrest and advised him of his rights. Johnson waived his rights and submitted to a tape recorded interview. He stated that he was at his girlfriend's house from about 10:00 or 11:00 a.m. on November 11, until about noon the following day. During that time, he was not near the area where the murder occurred. He stated that Codrington and Vasquez are members of the 5.9 Bloods, but that he himself is not. Johnson's statement was played for the jury at trial.
Vasquez called his cousin, Ron Stamp, as an alibi witness. Stamp testified that between 7:15 and 7:30 on the night of the murder, he spoke to Vasquez on the telephone at the home of Vasquez's uncle.

ASSIGNMENT OF ERROR NO. 1
The defendant contends the trial court erred in denying the motion to suppress the identification.
Defendant here contends that the identifications made by the State's witnesses were unreliable. Defendant does not challenge the identification procedures themselves; his argument is essentially one of sufficiency of the evidence. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)
In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the identity of the perpetrator. State v. Bovie, 95-474 (La.App. 5 Cir. 11/28/95), 665 So.2d 558. Moreover, where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Lott, 97-1002 (La.App. 5 Cir. 5/27/98), 712 So.2d 289; State v. Brumley, 97-104 (La.App. 5 Cir. 9/17/97), 700 So.2d 876.
Defendant argues the witnesses' identifications are not credible because they did not have an ample opportunity to view the perpetrators. On the contrary, the evidence linking defendant to the murder is substantial. Erica Pierre testified that she was sitting on the staircase when "Terry" came into the house through the nearby kitchen door. Defendant then pushed her out of the way as he went up the stairs. Erica testified that even though defendant's face was partially hidden by a black hood and red scarf, she could see his eyes. She further stated that she knew all the perpetrators by their eyes, the way they walked, and "everything about them." Erica identified defendant from a photographic lineup on the night of the murder and also made an in-court identification at trial. Erica testified that defendant is known by the nickname "T-Bone."
Lance Washington testified that he knew Terry Vasquez before the night of the murder, as defendant lived around the corner from Washington's grandmother. Washington has known defendant most of his life. Washington was seated in the living room near the front door of the house, but was able to see defendant enter through the kitchen door. He described defendant as wearing a red scarf and a hooded jacket to cover his face. Washington testified that he had no trouble recognizing defendant that night. In the past he has seen defendant *70 wearing the scarf, a symbol of the 5.9 Bloods gang. Despite defendant's disguise, Washington could see tattoos of an "X" and a teardrop under his eye. Washington identified those distinguishing marks in court. Washington also identified defendant from a photographic lineup on the night of the murder.
Aaron Pierre, Jr. also testified that he could see the kitchen door from his vantage point in the living room. He saw defendant enter the house wearing a red and white scarf on his face. He knew defendant as "Bone." According to Aaron, defendant was carrying a twelve-gauge shotgun. He identified State's Exhibit 1 as defendant's weapon. After the shooting, Aaron saw Vasquez remove his mask and exit the kitchen door. He saw defendant's "X" and teardrop tattoos. On the night of the murder, Aaron identified defendant from a photographic lineup. Defendant argues that Aaron could not have seen the perpetrators leave the house, as he testified he hid in a closet upon hearing the gunshot. However, Aaron testified that the closet door was ajar, and it opened toward the kitchen door.
Kevin Simmons, who was five years old at the time of the murder, was sitting on the staircase with Erica when the perpetrators entered the house. He testified that he knows defendant as "Terry" and has seen him around the neighborhood. According to Kevin, defendant was wearing a Starter jacket and a red "rag" when he entered the house. Kevin testified he has seen defendant wear the red "colors" in the past. Defendant had a hood on his head and the rag covered only part of his face. Kevin testified that defendant was carrying a gun and that he shot the victim, although Kevin did not see the shooting. Kevin did not see defendant remove his mask. However, Kevin identified Vasquez both in a photographic lineup and later at trial.
Defendant argues that, given Kevin's age, it was unreasonable for the jury to rely on his identification testimony. The record shows that the trial court followed the proper procedures to determine Kevin's competency to testify. See State v. Troulliet, 94-183 (La.App. 5 Cir. 9/14/94), 643 So.2d 1267; State v. Doss, 522 So.2d 1274 (La.App. 5 Cir.1988), writ denied, 530 So.2d 563 (La. 1988). The judge questioned the child out of the jury's presence. When asked what it means to tell the truth, Kevin responded, "Don't story." The judge asked him whether he would be able to tell the truth to the jury and he said he would. When the judge asked, "What is it when you are doing something wrong?" Kevin responded, "God will punish you." Kevin's testimony before the court was coherent, and his answers were responsive to the questions asked.
It was for the jurors, the triers of fact, to judge the child's credibility. It is well settled that the credibility of witnesses may not be re-weighed on appeal. State v. Gaines, 97-672, p. 5 (La.App. 5 Cir. 2/25/98), 707 So.2d 1354, 1358, writ denied, 98-1039 (La. 9/18/98), 724 So.2d 749; State v. Jiron, 96-319, p. 3 (La.App. 5 Cir. 10/1/96), 683 So.2d 769, 771.
Each of the aforementioned witnesses was certain that defendant was one of the perpetrators, despite the perpetrators' attempts to disguise their faces. In State v. Goodwin, 96-0334 (La.App. 4 Cir. 11/19/97), 703 So.2d 168, writ denied, 97-3159 (La. 4/24/98), 717 So.2d 1164, the court found that the defendant's second degree murder conviction was supported by the witness' identification where she recognized the defendant's features through a ski mask and also recognized his voice. In State v. Jones, 96-1581 (La.App. 3 Cir. 6/4/97), 696 So.2d 240, the defendant was convicted of first degree murder after a store clerk identified him as the masked gunman who had robbed a store. The reviewing court found the clerk's testimony sufficient to support the conviction, where the witness said she had spoken to the defendant on several occasions, and she recognized him by his shape, build, walk, and voice.
Detective Gurtner, who conducted the photographic lineups in the instant case, testified that none of the witnesses identified anyone other than Vasquez and his co-defendants during the course of the investigation. Moreover, Gurtner stated that at least one witness, Aaron Pierre, Jr., named "T-Bone" as one of the perpetrators when he was *71 interviewed at the scene of the murder. Aaron Pierre, Sr. and Mrs. Pierre were the only occupants of the house who did not make identifications. They did not, however, have a prior acquaintance with Vasquez. Mrs. Pierre also testified that she did not get a good look at the gunman.
The evidence was sufficient to rule out any reasonable probability of misidentification. Accordingly, we find no merit to the assignment of error.
We found a patent error in the record, in that the trial court did not inform Vasquez of the three-year delay for filing an application for post conviction relief, as required in LSA-C.Cr.P. art. 930.8. Therefore, we order the trial court to send written notice of the prescriptive period to defendant within ten days of the rendering of this Court's opinion and to file written proof in the record that defendant received such notice. See State v. Kershaw, 94-141 (La.App. 5 Cir. 9/14/94), 643 So.2d 1289.
For the foregoing reasons, the conviction is affirmed.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] The record shows that the names Cedrington and Codrington were used interchangeably below. Prior to trial, the parties entered into a stipulation that the co-defendant's true name is Codrington.
[2] The record before us does not contain a transcript of the sanity proceedings.
[3] Vasquez's co-defendants, Codrington and Johnson, also appealed. Their convictions were recently affirmed by this Court. State v. Cedrington, 98-253 (La.App. 5 Cir. 12/16/98), 725 So.2d 565.
[4] Ballistics tests did not tie the gun in evidence to the murder. Louise Walzer, an expert in firearms identification, testified that the projectile removed from the victim's body was consistent with a twelve-gauge, but tests were inconclusive as to whether the spent shell found near the victim at the scene was fired from State's Exhibit 1.
[5] By agreement of counsel, all hearsay and references to his co-defendants' gang affiliations were excised before Codrington's statement was played for jurors.