NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 06-1470

STATE OF LOUISIANA

VERSUS

KENNETH E. SMITH

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 13977-03
HONORABLE DAVID KENT SAVOIE, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, Jimmie C. Peters, and Glenn B. Gremillion, Judges.

AFFIRMED AND REMANDED WITH INSTRUCTIONS.

John Foster DeRosier
District Attorney
14th Judicial District Court
P. O. Box 3206
Lake Charles, LA 70602-3206
(337) 437-3400
Counsel for Plaintiff:
State of Louisiana

**Edward Kelly Bauman**
**La. Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**Counsel for Defendant:**
**Kenneth E. Smith**

**Kenneth E. Smith**
**Camp D Raven 1-L-4**
**Louisiana State Prison**
**Angola, La 70712**
**In Proper Person**

**SAUNDERS, Judge.**

On May 4, 2004, the Defendant, Kenneth E. Smith, was convicted of armed robbery with a firearm, in violation of La.R.S. 14:64 and La.R.S. 14:64.3. On September 3, 2004, he was sentenced to serve thirty years at hard labor without benefit of probation, parole, or suspension of sentence for armed robbery and to five years at hard labor without benefit of probation, parole, or suspension of sentence for armed robbery with a firearm, with the two sentences to run consecutively.

The Defendant filed a Motion and Order for Appeal on April 18, 2005, which was granted by the trial court. The appeal, however, was dismissed as untimely. *State v. Smith*, an unpublished opinion bearing docket number 05-1355 (La.App. 3 Cir. 3/1/06).

On September 29, 2006, the Defendant filed a pro se application for post conviction relief seeking an out-of-time appeal, which was subsequently granted on July 21, 2006. The order for an out-of-time appeal was signed on September 12, 2006. The Defendant now appeals his conviction, alleging that the evidence is not sufficient to support the verdict. We affirm the Defendant's convictions.

## FACTS:

On the evening of April 30, 2001, an armed robbery occurred at the Engine 89 Sports Bar in DeQuincy, Louisiana. The victim and sole witness to the crime, Nancy Erwin, head bartender, identified the Defendant as the perpetrator, and he was subsequently arrested, charged, and convicted for the crime.

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one error patent, and the minutes of sentencing are in need of correction.

First, the record does not indicate that the trial court advised the Defendant of the prescriptive period for filing an application for post-conviction relief, as required by La.Code Crim.P. art. 930.8. Thus, we direct the trial court to inform the Defendant of the provisions of article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

Next, we find that the minutes of sentencing require correction. The minutes state that the trial court imposed the five year sentence under La.R.S. 14:64.3 to be served in the Department of Corrections. The transcript of sentencing states:

> In connection with the armed robbery charge, I sentence the defendant to serve thirty (30) years with the Department of Corrections without benefit of probation, parole, or suspension of sentence. In connection with the armed robbery with a firearm I sentence him to serve a consecutive term of five (5) years without benefit of parole, probation or suspension of sentence.

The judge did not order that the five years be served in the Department of Corrections. We note that a sentence imposed under La.R.S. 14:64.3 is not to be imposed at hard labor.[1] *See State v. Wardsworth*, 04-1572 (La.App. 3 Cir. 5/25/05), 904 So.2d 65. Thus, we instruct the trial court to delete the provision in the sentencing minutes which states that the Defendant's sentence imposed under La.R.S. 14:64.3 is to be served in the Department of Corrections.

**ASSIGNMENT OF ERROR:**

---

[1]In 2006, La.R.S. 14:64.3 was amended to provide that the sentences are to be served at hard labor; however, the law at the time of the offense stated otherwise.

The Defendant argues in his sole assignment of error that the evidence is not sufficient to support the verdict. Specifically, the Defendant asserts that Ms. Erwin never saw the perpetrator's face and that the cameras indicate that no robbery had even occurred. Accordingly, the Defendant contends that Ms. Erwin's testimony that she believed the disguised person was the Defendant was not sufficient to find him guilty beyond a reasonable doubt.

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Further, as noted in *State v. Hall*, 03-906, p. 11 (La.App. 5 Cir. 5/26/04), 875 So.2d 996, 1004, *writ denied*, 04-1875 (La. 12/10/04), 888 So.2d 834:

> In addition to proving the statutory elements of the charged offense, the State is required to prove the identity of the perpetrator. *State v. Vasquez*, 98-898 (La.App. 5 Cir. 2/10/99), 729 So.2d 65, 69. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *Id*.

The elements of the crime at issue are set forth in La.R.S. 14:64, which states, in pertinent part, "[a]rmed robbery is the taking of anything of value belonging to

3

another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." Further, as stated in La.R.S. 14:64.3, "[w]hen the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned for an additional period of five years without benefit of parole, probation, or suspension of sentence."

The victim, Nancy Erwin, testified that on the evening of April 30, 2001, she was working alone as head bartender at Engine 89 Sports Tavern in DeQuincy, Louisiana. At approximately 11:00 p.m., there were no customers in the bar, and Ms. Erwin was contacted by the owner, Tammy Louviere, and instructed to shut the bar down. From video surveillance cameras installed in the bar, Ms. Louviere was able to observe that Ms. Erwin had begun cleaning and that there were no patrons in the bar.

After collecting the trash, Ms. Erwin exited the bar to dispose of the same. She stopped by her car first, to put her jacket inside, and after doing so, a man dressed in blue jeans, a flannel-like jacket with a grey hood over his head, a bandana covering his nose and mouth, a pair of sunglasses, and lime green gloves jumped out at her. According to Ms. Erwin, the man was armed with what looked like an antique .22 revolver. He pointed the gun at Ms. Erwin and told her "to give it to him now." Because she was carrying trash rather than money, he forced her to go back into the bar to get money, as he walked behind her pointing the gun at her head.

Ms. Erwin stated that she did not recognize the man at first, but as she opened the door to go back into the bar, she glanced at the man and noticed something familiar about him. She testified that she recognized the man's voice and the way he

4

was talking and identified it as that of the Defendant. Although she stated that she could see only a small part of his face, near his right eye, Ms. Erwin testified that the man's physical features, the way he walked, his height, and his size also led her to believe the man was the Defendant. When she realized who it was, she asked the Defendant, "Why?" According to Ms. Erwin, at that time, the Defendant became irritated and demanded that she "get it and now." She then retrieved the money from the safe located on a shelf underneath the bar, while the Defendant continued to point the gun at her.

After Ms. Erwin placed the money inside a white bag and gave it to the Defendant, she testified that he instructed her to lie down on the floor. Next, she heard the door open and close, and then waited a bit before calling out to see if anyone was there. When she got no response, she jumped up, locked the doors, and called the DeQuincy Police Department. Ms. Erwin also called the bar owners, Tammy and Percy Louviere, as well as some friends that she was supposed to meet after closing to let them know she had been robbed.

Ms. Erwin testified that the Defendant, without a doubt, was the man who robbed the bar. She stated that she had known the Defendant for about ten years. She explained that, at one time, she lived directly behind a woman that the Defendant lived with, and she had also babysat the woman's child. Additionally, Ms. Erwin testified that she had gone out with the Defendant in a group setting and that he had stayed at the homes of her mother and her ex-husband.

On cross-examination, Ms. Erwin stated that the Defendant should have been visible on camera when he was at the door. Also, Ms. Erwin testified that the area where her car was parked was not well lit at the time. She explained that her car was

5

parked in a "shadow area." According to Ms. Erwin, a street light illuminated the parking lot, so there was enough light to be able to see. With regard to the Defendant's gun, Ms. Erwin testified that she believed it to be a gun that the Defendant had tried to sell to Percy Louviere. She based this belief on Mr. Louviere's description of the gun. However, she admitted that she had never seen the Defendant's gun prior to the robbery.

Next, Detective Terrel Vandergriff and Police Chief Michael Suchanek, both of the DeQuincy Police Department, testified about the investigation. Detective Vandergriff stated that he was dispatched to the scene of the armed robbery at the Engine 89 Sports Bar at about 11:30 p.m. on April 30, 2001. He was advised by Corporal Henry that the Defendant was the perpetrator, and he was given a description of the Defendant. When he first saw Ms. Erwin, she reported that she had been robbed and seemed "real upset" and "acted kind of frantic. Detective Vandergriff testified that Ms. Erwin showed him where everything happened, i.e., where she was approached in the parking lot, where her car was parked, the location of the safe, and how the bar stools were sitting up. Detective Vandergriff was not able to locate the Defendant that evening.

Detective Vandergriff took a statement from Ms. Erwin about an hour following the robbery, and the statement concluded at about 2:00 a.m. At that time, Ms. Erwin could not recall the color of the bandana worn by the Defendant. With regard to the gun she saw that evening, Ms. Erwin also told Detective Vandergriff that she identified the gun the Defendant was carrying as a small caliber revolver that the Defendant had previously shown to her after having stolen or taken it from his mother.

6

On May 22, 2001, Detective Vandergriff and Chief Suchanek interviewed the Defendant at the Beauregard Parish Sheriff's Department. In the presence of Chief Suchanek, Detective Vandergriff read the Defendant his *Miranda* rights, and both men watched the Defendant initial each line and sign at the bottom of the document. Chief Suchanek was present the entire time. According to Chief Suchanek, neither he nor Detective Vandergriff promised the Defendant anything in return for his cooperation. Chief Suchanek stated that the Defendant did not appear to be suffering from any mental defect or to be under the influence of drugs or alcohol.

After reviewing the Defendant's *Miranda* rights and obtaining his signature indicating that he understood and waived same, the Defendant began talking about the robbery. According to Detective Vandergriff and Chief Suchanek, the Defendant started the conversation, stating that he knew that they were there to ask him about a robbery that had taken place in a bar in DeQuincy. The Defendant told Detective Vandergriff that he was not in DeQuincy the evening of the robbery and that he heard that Ms. Erwin robbed herself.

Next, the Defendant asked Detective Vandergriff if Ms. Erwin said anything about his tattoos when she described him to authorities and if there were any video cameras in the bar. Once Detective Vandergriff told the Defendant that there were cameras in the bar, he advised that he wanted to speak with his lawyer and did not want to answer any questions. No more questions were asked, and the Defendant was arrested at that point for the robbery.

Chief Suchanek did not hear the Defendant state at any time that they needed to talk to his father because his father would tell them that he was not in town at the time of the robbery. Chief Suchanek further testified that he had known the

Defendant for about ten years and had the Defendant asked him to talk to his father, he would have done so.

On cross-examination, Detective Vandergriff testified that he did not recover a surveillance tape from the bar, and as far as he knew, a tape did not exist. Detective Vandergriff stated that he told the Defendant that video cameras were in the bar, but he did not recall telling the Defendant that an actual tape existed. Detective Vandergriff testified that when he asked the bar owners, Percy and Tammy Louviere, to produce the surveillance tape from the evening of the robbery, they stated that there was no tape because the camera was not on at the time of the robbery and that there was no tape for the entire night.

Christina Alegria testified that the Defendant was her ex-boyfriend, that the relationship ended at the end of 2000, and that they have not had contact since February 2001, when she moved to El Paso, Texas. In 2000, Ms. Alegria was employed at the Engine 89 Sports Bar as a bartender, and on occasion, the Defendant helped her close the bar. According to Ms. Alegria, the Defendant was familiar with the closing procedure and knew that she had to take the money to the Louvieres' home after closing. He also knew the location of the safe and registers where all the money was kept. Ms. Alegria testified, however, that the Defendant never helped her sort or count the money, nor did he ever try to take the money from her. Lastly, Ms. Alegria testified that she was instructed by the Louvieres not to turn off the florescent lights upon closing, and in her opinion, there should have been enough lighting for the cameras to pick up, if the florescent lights were on.

Owner Tammy Louviere testified that money came up missing during the time of Ms. Erwin's employment at the bar. She stated, however, that other people were

8

also working at the bar during the time of Ms. Erwin's employ. According to Ms. Louviere, all of the employees were instructed to leave the lights on so that she could see the images from the four cameras.

On the evening of April 30, 2001, when Ms. Louviere called Ms. Erwin to shut the bar down, she could see from the home monitor that business was slow. According to Ms. Louviere, the cameras in the bar were working, there was sufficient light to see images from the bar, and she could visualize four different images at her home. After she called Ms. Erwin to close the bar, Ms. Louviere was not sure if she went to sleep or walked out of the room, away from the monitor.

Ms. Louviere stated that when she was notified by Ms. Erwin of the robbery, she looked at her monitor and noticed that the lights were out. She stated that she was sure that she had looked at the monitor and that she thought the monitor was dark because there was nothing to see.

According to Ms. Louviere, she and her husband looked at the tape made the evening of the robbery and determined that the lights had been turned out because nothing could be seen. She was asked when she and her husband viewed the tape, and she responded, "We had to have looked at it probably that night." Ms. Louviere was certain that the investigating officers asked her to retrieve the tape from the camera. However, she stated that she did not recall whether she actually gave the tape to the police or whether she told them there was nothing on it. She further testified that she had no idea where the tape was located at the time of trial. Ms. Louviere assumed that she and her husband must have kept the tape because the police did not have it. She further testified that if she told the police that there was

nothing to see on the tape, then the lights must have been turned off. She denied the possibility that she did not see a tape at all.

With regard to the camera system installed in the bar, Ms. Louviere explained that the images she can see from her home are not necessarily the images that are recorded. There are about twelve total images that are picked up from the cameras, and she can switch between the four cameras from her home. A tape is running continuously, and a fresh tape is put in at the end of each shift. Lastly, Ms. Louviere stated that she was aware that the Defendant was familiar with the bar, due to his prior relationship with Christine Alegria.

As to the gun used in the commission of the crime, Kathy West, the Defendant's mother, testified that she has never owned a gun or had a gun registered in her name, nor has there ever been a gun in her house. Also, Ms. West asserted that the Defendant has never stolen a gun from her.

Next, several alibi witnesses were called to testify regarding the Defendant's whereabouts on April 30, 2001. The Defendant's father, Stanley Smith, testified that the Defendant, along with his girlfriend, Lynn Dunn, and Lynn's daughter and grandson, were at his home on the evening of April 30, 2001. The Defendant's brother, Terrel, was also present. Mr. Smith testified that they barbequed and attempted to change the tires on the Defendant's car. According to Mr. Smith, the Defendant left his home between 9:30 and 9:45 p.m. Finally, Mr. Smith stated that his home, located in Fields, Louisiana, is approximately twenty-five miles from the Engine 89 Sports Bar.

On cross-examination, Mr. Smith admitted that he pled guilty to a charge of simple battery in 1983 and was convicted of trespassing in 2002. He also testified

that he believed that he barbequed for the Defendant on a Saturday, although April 30, 2001 fell on a Monday. He also testified that when he learned that the Defendant had been arrested for a robbery that occurred on April 30, 2001, he did not go to the police and report that the Defendant was with him that evening. Further, he never reported same to the district attorney's office, and he first spoke of it with the Defendant's attorney the morning before or the morning of the trial.

Terrel Smith, the Defendant's brother, also testified about the barbeque allegedly held at their father's house on April 30, 2001. Terrel confirmed that the Defendant left the house with his girlfriend at some time between 9:30 to 10:00 p.m. Terrel also believed that the barbeque occurred on a weekend. After the Defendant was arrested, Terrel did not report to the police or the district attorney that the Defendant was with him at the barbeque. The first time that he talked to anyone about the Defendant's presence at the barbeque was to defense counsel in March, 2004, just prior to the trial date being set.

The Defendant's girlfriend at the time of the robbery, Theresa "Lynn" Dunn, and Ms. Dunn's daughter, Jessica Reed, testified that on April 30, 2001, they both traveled with the Defendant from their homes in Newton, Texas to Stanley Smith's house for a barbeque. The Defendant was living with Ms. Dunn at the time of the barbeque and his arrest. According to Ms. Dunn, they were not celebrating a special occasion, and there was nothing special about the gathering. While at Mr. Smith's house, they looked at her tires on her car that were making a roaring noise. Next, Ms. Dunn and Ms. Reed testified that they departed from Mr. Smith's house that same evening, along with the Defendant, before 10:00 p.m. and arrived home around 11:00 p.m. The drive home took about an hour to an hour and fifteen minutes. Ms. Dunn

11

stated that they did not pass the Engine 89 Sports Bar on their way home and that the Defendant was in her presence the entire time. Ms. Reed testified that she was one hundred percent certain that the Defendant was with her from the time she left Louisiana until they arrived back in Newton, Texas.

On cross-examination, Ms. Dunn stated that she was not sure if the barbeque was on a weekend because of her varied work schedule as a nurse. When questioned further, she admitted that she was not certain of the date of the barbeque or whether the barbeque was the same date as the robbery. Ms. Dunn was only certain that the Defendant was living with her when he was arrested. Ms. Dunn was not able to confirm that the barbeque was the same night of the robbery and stated that ". . . it's the same night everybody else has been saying." She explained that for three years, the Defendant's family has been saying it was the same night as the robbery. Ms. Dunn stated that she never really thought about it or disputed it. Lastly, Ms. Dunn testified that the first time spoke with anyone about the barbeque being on the same date as the robbery was with defense counsel at the March 2004 trial fixing, and she never reported to investigators that the Defendant was with her the night of the robbery.

When questioned by the court regarding her work schedule, Ms. Dunn stated that she worked as a "PRN" on an hourly basis and usually worked the 2:00 to 10:00 p.m. shift. Ms. Dunn did not ask her employer for any information to confirm whether she worked on a particular day. Ms. Dunn also told the court that she believed Mr. Smith told her right before the Defendant was arrested that the Defendant had been accused of a crime. At the time he was arrested, she did not

12

know that he was being charged with the armed robbery that occurred on April 30, 2001, but, instead, thought he had committed a crime in Texas.

Like Ms. Dunn, Ms. Reed was also unable to recall what day of the week they attended the barbeque. Within a day or two after the barbeque, Ms. Reed heard the rumor that the Defendant had robbed the Engine 89 Sports Bar. Ms. Reed stated that she thought the Defendant had been arrested for a parole violation, and thus, she never informed authorities that the Defendant was with her on the evening of April 30, 2001. Ms. Reed testified that she was certain that the Defendant was with her and her family on April 30, 2001. On cross-examination, and upon examination by the court, Ms. Reed did not waiver in her certainty that the barbeque was on April 30, 2001, and that the Defendant was with her that day. She stated that she remembered the particular date because it was the only barbeque that she went to with her mother and the Defendant. Ms. Reed also testified that the first time she told defense counsel about the barbeque was the day before trial. Finally, Ms. Reed admitted, once more, that she knew, within one to two days following the barbeque, that the Defendant was accused of a crime that had occurred on April 30, 2001, but did not tell anyone that he was with her that day. When asked by the court why she did not say anything, she replied, "I know he couldn't have did it."

Betty Daniels, a dispatcher at the DeQuincy Police Department, testified that Ms. Erwin entered the police department one day yelling at her because the Defendant had not been arrested. According to Ms. Daniels, Ms. Erwin reported that the Defendant had a gun; however, she never saw it.

Ms. Erwin testified that she spoke with Betty Daniels on more than one occasion about the robbery. However, she did not recall telling Ms. Daniels that she

13

never saw a gun during the robbery. Ms. Erwin testified that she spoke with other employees at the police department, but does not recall their names. On one occasion, she gave the police the name of a person who knew about the robbery in advance. According to Ms. Erwin, a woman named Angie told her that she knew that the Defendant was going to rob the bar before the incident happened.

At the conclusion of the trial, the trial court stated its reasons for ruling as follows:

THE COURT:

All right. The Court has heard the evidence in connection with this case. Certain parts of it kind of stick out to me. Basically, that the defendant had an opportunity to be aware of what the procedure was for the people, was aware that they would carry the money outside the store, or outside the bar, and would then take it to the owners, and that that would be the prime time when you would not be caught on the video or otherwise seen since there were -- I heard no testimony that there was any monitor which viewed the outside; everything I heard was that the monitor viewing the inside. It would have been nice to see the video tape, but we don't have it. Exactly why we don't have it, I don't know. But I am convinced that Nancy Ann Erwin was accosted on April 30th, 2001, by this defendant while armed with a dangerous weapon, particularly a revolver, and find him guilty of armed robbery.

In connection with the alibi testimony, I find it incredulous [sic] that people would not talk about an event th [sic] was so clear and it happened so quickly with anyone until three years after the fact, that this individual was with them on that particular day and that it was impossible for him to do it. There were many inconsistencies in the testimony, particularly about what day of the week it was, it was on a Monday, and I thought that there was ample opportunity if they were so convinced that he had done that, to do something to corroborate what that is, other than just get a bunch of people to say we had a barbecue on a day and it had to be April the 30th, when they all say it's a Saturday, when, in fact, this incident, the Court took judicial notice of, took place on a Monday night, which traditionally would be a slow night in a bar, such as the Engine 89. The defendant will be --

. . . .

MRS. WILLIAMS [Defense Counsel]:

14

I do want to ask, Your Honor, if you've read over Nancy's statement and saw the inconsistencies in that?

THE COURT:

My appreciation of the Statute is that it can be utilized, introduced into evidence, those portions which relate to the testimony of the witness, and I have reviewed the statement of the witness. There are some things that are slightly inconsistent, but everything kind of flows together.

I'm satisfied that she was telling the truth, that she was accosted, that she was robbed of money that belonged to the bar by a person armed with a dangerous weapon. And I believe, as she believed, that person is this defendant. He -- and the Court is aware, because I've seen him in court before, has numerous tattoos on his arm, and an individual is going to rob someone who knew what was going on would, in fact, cover up those tattoos, which this individual had -- had a jacket on, had blue jeans on, had a bandanna, had shades on. And I'm satisfied that this witness recognized his mannerisms, recognized his voice and the way he spoke, and recognized the manner in which he walked, having been familiar with him for the period of time with which he [sic] testified.

In his brief to this court, the Defendant asserts, first, that no evidence of guilt can be derived from the police officers' account of their encounter with the Defendant in the Beauregard Parish Prison. The Defendant maintains that there is nothing incriminating about his volunteered statement, which indicated that he knew why the police had come for him. Because Ms. Erwin reported the crime and that knowledge of it had become public in the small town within a day or two of the crime, the Defendant contends that it would have been suspicious if he did not reveal that he knew why they had come for him. The Defendant also avers that no probative value arises from his invocation of his right to an attorney and right to remain silent once officers told him that there was a surveillance tape of the crime.

First, we note that the Defendant was not in prison at the time of his questioning, nor had he been placed under arrest. The Defendant was interviewed at

the Beauregard Parish Sheriff's Department and began talking after he was read his *Miranda* rights. The Defendant was not arrested until he advised officers that he wanted to speak with his lawyer and did not want to answer any questions. The Defendant is correct that the State offered this evidence to establish his guilt. However, the trial court did not mention this evidence in its reasons for ruling, and thus, there is no indication that the trial court found evidence of guilt as a result of same.

Next, the Defendant complains that his conviction stands solely on Ms. Erwin's stated belief that the person underneath the disguise was the Defendant and that under the circumstances, the evidence is not sufficient to prove beyond a reasonable doubt that the Defendant committed the robbery. More specifically, the Defendant is critical of the fact that Ms. Erwin did not see her assailant's face. Despite Ms. Erwin's testimony that her assailant was of the same size and walked like the Defendant, the Defendant asserts that he is an average-sized man and complains that Ms. Erwin did not offer any explanation or description of the way he walks or how he walks differently from anyone else.

The Defendant is also critical of Ms. Erwin's identification of her assailant's voice because her assailant only spoke in one or two word commands. The Defendant further contends that his voice and that of Ms. Erwin's assailant were not a perfect match since she did not make a connection until the voice of the assailant became deeper and agitated. Considering this, the Defendant concludes that Ms. Erwin could not have been reasonably certain that the assailant was the Defendant, and thus, the trial court should have had a reasonable doubt regarding his guilt.

16

In its opposition brief, the State contends that the jurisprudence does not support the Defendant's assertion that Ms. Erwin's identification of him by his voice is insufficient to sustain his conviction. The State refers this court to *State v. Zeno*, 99-69 (La. App. 5 Cir. 8/31/99), 742 So.2d 699, wherein the appellate court stated,

> We have previously held that a witness' identification of a defendant by voice or other distinguishing characteristics is identification sufficient to support a conviction. See *State v. Vasquez*, 98-898 (La.App. 5 Cir. 2/10/99), 729 So.2d 65 and the cases cited therein. In the matter before us, the evidence presented was sufficient to rule out any reasonable probability of misidentification.

*Id*. at 706. Relying upon this, the *Zeno* court concluded that the witness' testimony that he recognized the defendant by his voice and his dread locks hanging from under his hood was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of the crime.

The State also directs this court to its decision in *State v. Wommack*, 00-137 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. In *Wommack*, the defendant argued that the evidence was not sufficient to support his conviction, contesting the victim's testimony regarding identification of the assailant's voice. In determining there was no merit in the defendant's argument, the court pointed out that the victim testified she immediately recognized the voice of the assailant as that of the defendant. The court also noted the victim's testimony that she had worked with the defendant for approximately one and one-half years and that he had been friends with her husband. Additionally, the court observed that the defendant had visited in the victim's home and was a guest in her van on several occasions. Finally, the court noted that the victim heard the assailant's voice on three separate occasions and that throughout the matter, she was unequivocal in her identification of the assailant's voice as that of the defendant.

17

In the instant case, the record indicates that Ms. Erwin was very familiar with the Defendant. First, her testimony indicated that she had known the Defendant for approximately ten years. During that time, Ms. Erwin stated that she lived directly behind a woman with whom the Defendant had lived and that she babysat the woman's child. Ms. Erwin also testified that she had gone out with the Defendant in a group setting and that he had stayed at the homes of her mother and ex-husband.

Although she did not recognize her assailant at first, Ms. Erwin testified that she recognized the Defendant's voice and the way he was talking as she opened the door to go back into the bar. She also stated that the man's physical features, the way he walked, and his height and size led her to believe that the man was the Defendant. Finally, Ms. Erwin testified, without a doubt, that the Defendant was the man who robbed the bar.

We note that the defense did not offer any evidence to refute Ms. Erwin's familiarity of the Defendant. Additionally, Ms. Erwin identified not only the voice of the Defendant, but also stated that his size and gait were the same as that of the Defendant. She consistently reported that the voice of her assailant belonged to the Defendant. Considering the holdings in *Wommack* and *Zeno*, we find that Ms. Erwin's identification of the Defendant by his voice, physical features, and mannerisms indicates that she was reasonably certain that the assailant was the Defendant. Thus, we find that her testimony regarding the same was sufficient to support his conviction.

The Defendant concludes, "In addition to Ms. Erwin's strange testimony and several prior inconsistent statements regarding the 'antique' .22 revolver and whether she recognized the defendant by sight or only by voice, the most compelling reason

18

to doubt Mr. Smith's guilt in light of Ms. Erwin's uncorroborated testimony is the fact that no robbery was captured on the video recording." The obvious problem with the Defendant's contention is that he fails to develop this argument. His brief ends abruptly without further discussion of the issues. The Defendant does not identify the "strange testimony" or the inconsistent statements he refers to, nor is he specific about the testimony of Ms. Erwin that he maintains is uncorroborated.

With regard to the videotape, the record reflects that the police never saw, nor were they given, a tape from the evening of the robbery to establish that the cameras were recording that evening. Further, when Detective Vandergriff asked the Louvieres to produce the surveillance tape from that evening, they reported that there was no tape because the camera was not on at the time of the robbery and that there was no tape for the entire night. The only evidence in the record that a tape existed is the testimony of Tammy Louviere, who stated that cameras were working prior to the robbery because she could see images of the bar on the monitor at her home. We note, however, that Ms. Louviere was not asked, nor did she state, if she saw any *recorded* images from that evening to indicate that the cameras were not only picking up the images, but were also recording properly, or that a tape, in fact, had been put in that evening.

As to Ms. Erwin's statements regarding the "antique" .22 revolver, she initially reported, in her statement to police, that the assailant had a gun in his right hand, that it was a revolver, and that it looked liked like it may be antique. Later, in her statement, she said:

> That's when I got a good look at the gun. I recognized it as the gun he had stolen from his mother a few months ago. I know this gun, because I have seen it before. That was several months ago when he had come into the bar ant tried to sell the gun to Percy Louviere. I am positive that

it was the same gun. It was an antique .22 revolver. It's a dark colored gun. It really is in need of cleaning.

Detective Vandergriff confirmed these statements at trial. According to Detective Vandergriff, Ms. Erwin reported in her statement that she recognized the gun used in the commission of the crime to be a small caliber revolver. Detective Vandergriff added, "I think she said Kenny showed it to her, or Mr. Smith had showed [sic] it to her, prior to that, for some - - some reason. He's supposed to have stolen it from his mother or something, or taken it from his mother."

At trial, Ms. Erwin testified that her assailant was armed with what she thought looked like an antique .22 revolver. When asked how she recognized the gun, Ms. Erwin stated that she had never actually seen it. She testified that she assumed that it was the gun that the Defendant had offered to sell to Mr. Louviere. Ms. Erwin admitted that although she believed it was the same gun described to her by Mr. Louviere, and that with certainty, she reported same to police, she, in fact, was not certain that it was the same gun. We note that Mr. Louviere was not called to testify, and thus, there is no evidence which refutes Ms. Erwin's testimony or her assumption regarding the gun, other than her prior statement to police. The weapon allegedly used in the commission of the crime was never retrieved.

As noted by this court in *State v. James*, 99-1858 (La.App. 3 Cir. 5/3/00), 761 So.2d 125, 129, *writ denied*, 00-1595 (La. 3/23/01), 787 So.2d 1010:

> It is well-settled that the victim's credibility is a matter for the fact finder to assess, and that the appellate courts will not second-guess such assessments, absent manifest error. *State v. Bourque*, 94-291 (La.App. 3 Cir. 11/2/94); 649 So.2d 670. In *Bourque*, we did overturn such an assessment, but only where the defendant presented credible alibi testimony in the face of questionable eye-witness testimony. (The only witnesses to the crime were a child and an adult who had consumed a large amount of alcohol before witnessing the incident.) In the present case, the victim was not a weak witness. She positively identified

20

Defendant as her attacker, and she presented a motive with underlying facts that were confirmed at trial.

Also, the State in its opposition stresses that the identification by a single witness is sufficient to support a conviction, even in the face of considerable alibi testimony. *State v. Brian*, 502 So.2d 293, 296 (La.App. 3 Cir. 1987). The court in *Brian* also stated:

> When there is conflicting testimony as to factual matters, the question of the credibility of a witness is within the sound discretion of the trier of fact. *Johnson*, *supra* [461 So.2d 551 (La.App. 3rd Cir.1984)]; *State v. Tassin*, 472 So.2d 340 (La.App. 3rd Cir.1985), *writ denied*, 477 So.2d 97 (La.1985). A trial judge's factual determinations are entitled to great weight and they will not be disturbed unless they are clearly contrary to the evidence. *State v. Cobbs*, 350 So.2d 168 (La.1977).

Id. at 296.

In the instant case, the trial court addressed the testimony of the alibi witnesses in its reasons for ruling, concluding that it found it "incredulous" that the witnesses did not talk to anyone about the event until three years after the fact. The trial court also believed that the inconsistencies about the day of the week on which the barbeque was held did not prove to be credible, in light of the fact that there was "ample opportunity" to do "something" to corroborate their claims that it occurred on April 30, 2001. Accordingly, without credible alibi witnesses, we find that the testimony of Ms. Erwin, the sole eyewitness, is sufficient evidence to convict the Defendant.

**PRO SE ASSIGNMENTS OF ERROR NOS. 1 AND 2:**

By these assignments of error, the Defendant appears to assert a claim of double jeopardy. Specifically, he contends that the charges for which he was convicted, La.R.S. 14:64 and 14:64.3, arise out of the same transaction and resulted from the same evidence, resulting in double jeopardy. We find that La.R.S. 14:64.3

21

serves as a sentencing enhancement to La.R.S. 14:64, and thus, there is no merit in the Defendant's claim of double jeopardy. *See State v. Walker*, 01-51 (La.App. 5 Cir. 5/30/01), 789 So.2d 86, *writ denied*, 01-1922 (La. 5/10/02), 815 So.2d 834, and *State v. Jefferson*, 40,439 (La.App. 2 Cir. 1/27/06), 920 So.2d 984.

## CONCLUSION:

The Defendant's conviction is affirmed. However, the case is remanded and the trial court is instructed to delete the provision in the sentencing minutes which states that the Defendant's sentence imposed under La.R.S. 14:64.3 is to be served in the Department of Corrections.

Additionally, the trial court is directed to inform the Defendant of the provisions of article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.