MARC E. JOHNSON, Judge.
| ¡¿Defendant appeals his conviction for attempted simply burglary from the 24th Judicial District Court, Division “I”. For the following reasons, we affirm the conviction.

STATEMENT OF THE CASE

On March 22, 2010, the Jefferson Parish District Attorney’s Office filed a bill of information charging Defendant, Rodney Untereiner, with one count of simple burglary, a violation of LSA-R.S. 14:62. Defendant pleaded not guilty at arraignment. On May 13, 2010, Defendant filed various pre-trial motions including a Motion to Suppress the Statement(s), Motion to Suppress the Evidence, Rand Motion to Suppress the Identification. On December 1, 2010, the trial court heard and denied Defendant’s Motion to Suppress Identification.[1]
Defendant proceeded to trial on December 2, 2010 and was found guilty by a six-person jury of attempted simply burglary pursuant to LSA-R.S. 14:27 and 14:62, which is a responsive verdict to the crime of simple burglary. The trial court sentenced Defendant on December 16, 2010, to imprisonment at hard labor for five years. On that same date, the State filed a habitual offender bill of information alleging Defendant was a second felony offender. Defendant stipulated to the second felony offender status. The trial court vacated the underlying sentence and sentenced Defendant as a habitual offender to serve five years without the benefit of probation or suspension of sentence. Defendant also received credit for time served. Defendant filed a timely motion for appeal.

FACTS

The State’s key witness at trial was Mark McCullough, Jr. McCullough testified that on January 80, 2010, he was employed by Bayou Electric. As an employee, Mr. McCullough testified that one of his job duties included conducting a security check of his employer’s Chemtura Plant. McCullough explained to the jury that on the morning of January 30, 2010, he arrived at the Chemtura Plant (“the Plant”) located at Fourth Street, in Harvey, Louisiana, to perform a check of the Plant and bring a box containing a large breaker to the site. McCullough testified the entirety of the Plant property is surrounded by a large gate. Upon unlocking the gate, McCullough proceeded to back his pick-up truck to the loading dock located at the corner of the warehouse. Once parked, McCullough retrieved 14the breaker box and walked inside the Plant’s warehouse where he heard unexpected voices.
*428 McCullough further testified that it was around 9:00 a.m. in the morning and, although there was no electrical lighting in the Plant, he could see pretty well because of the daylight shining through the open door. At first McCullough stood still listening to the voices and then turned around to find two white males, approximately 20 feet away, standing in the Plant’s warehouse. The man in the front was wearing a khaki-colored jacket with blue jeans, while the man in the back was wearing a blue jean jacket with blue jeans. McCullough noticed that the man who wore the khaki-colored jacket had a reel of copper wire in his hand. McCullough did not recognize these two males. McCullough attempted to scare the men off by slamming the box he had in his hands on the ground. It was at this time that the two men looked up, threw the copper wire down, and ran through the warehouse’s side exit. McCullough then went back to his truck and began to follow the men along the Plant’s fence line.
According to McCullough, the two men went outside of the warehouse and began walking along the inside of the fence while McCullough followed along the outside of the fence in his truck. While in his truck, McCullough called his supervisor, Brian Newberry, to report the incident. McCullough confirmed that the two males he saw inside the building were the same men he was following along the fence line. McCullough testified that he had a good visual of the two men because the fence was a chain-link fence. He then proceeded to follow the two men until they climbed through a hole that had been cut in the fence. At this time, McCullough parked his truck, got out, and waited for the men to come through the ditch so he could confront them on top of the railroad tracks.
|5When the two men came up to the railroad tracks, McCullough asked them to identify themselves and demanded they state their purpose for being at the Plant. The men responded they had been sleeping at the Plant and did not do anything wrong. The two men began walking toward Maple Street, and McCullough followed them on foot. While following the men, McCullough continued to question them about their presence at the Plant to which he received no response. Once on Maple Street, the two men began to approach a house which Defendant claimed was their residence. When asked why he was sleeping at the Plant if he had a home, Defendant attempted to punch McCullough and push him away.
While in front of the house, McCullough decided to call 911 to advise them of his location. While waiting for the police officers to arrive, McCullough followed Defendant from the front yard of the house to the back yard, while the second male stood on the front porch. It was at this time that McCullough lost sight of the second male; however, McCullough testified that he never lost sight of Defendant. McCullough stayed on the phone with the 911 dispatcher until the police arrived.
Prior to the police’s arrival, McCullough testified Defendant jumped a three-foot-tall fence which lead out to Fairmont Street, the street behind Maple. Because the fence was only three feet tall, McCullough was able to maintain a visual on Defendant at all times. Once the police arrived, the responding police officer was able to arrest Defendant on Fairmont Street. McCullough further testified that the second male he had seen with Defendant inside the Plant was never found. However, McCullough did provide the police officers with a description of the second male, which included his approximate *429 age, ethnicity, and a description of the clothing he was wearing.
After arresting Defendant, the officer drove him back to the Plant.
| fiMcCullough met the officer back at the Plant with Newberry. While at the Plant, McCullough provided a voluntary statement concerning the incident and also positively identified Defendant as the man he saw in the Plant holding the copper wire. McCullough then testified that, while walking through the Plant with the police officers, a rolled up copper wire left behind by Defendant was found in the exact location where he dropped the wire. Upon further investigation of the building, they also found broken panels, a set of hand tools, a conduit that had been taken off of the wall with the wire stripped out, and a second roll of copper wire upstairs. McCullough stated that when he left the building the night before, the copper wire had not been removed, and the tools were not present. McCullough further testified that, although the copper wiring was never removed from the premises, Defendant was in the Plant on January 30, 2010, without permission, had the copper wiring in his hand, and dropped it when he noticed McCullough in the warehouse.
Brian Newberry, owner of Bayou'Electric and maintenance supervisor of the Plant, also testified on behalf of the State. On January 30, 2010, Newberry received a call from his employee, McCullough, regarding the incident in question. Newber-ry called 911 to report the incident and proceeded to drive to the Plant to assess the situation. Upon arrival at the Plant, Newberry testified that he noticed the entrance gate to the premises was open, and that his company pickup truck was parked by the railroad tracks with the engine on and the doors open. It was at this time that Newberry saw a police car turn on Maple Street and decided to follow. New-berry followed the police car to Maple Street where he saw, for the first time, Defendant with his hands on the police car.
Other than himself, and his employees, Newberry testified that no one else had permission or authority to enter the Plant or its premises. Newberry then 17confirmed Defendant was not an employee and, as such, did not have permission or authority to enter the Plant.
Next, Deputy Serbrina Howard of the Jefferson Parish Sheriffs Office testified that on the morning of January 30, 2010, she received a 911 dispatch call. Deputy Howard was initially dispatched to the Plant at 1805 Fourth Street to investigate a reported theft of copper. While in route to the Plant, Deputy Howard received additional information regarding the whereabouts of Defendant. Deputy Howard was advised that Defendant was at the four hundred block of Maple Street where Deputy Raymond Roy had apprehended him. Since Defendant had already been apprehended and was being transported by Deputy Roy back to the Plant, Deputy Howard proceeded back to the Plant to meet them. Upon arrival at the Plant, Deputy Howard had the opportunity to speak with McCullough about the incident. Specifically, McCullough told Deputy Howard he saw Defendant with the copper wiring in his hands, but he eventually dropped it and took off running when he noticed McCullough. McCullough further explained to Deputy Howard that Defendant, and the other male he was with, ran alongside the fence until they were able to fit through an opening underneath the fence enabling them to cross over to Fourth Street and Maple Street. Deputy Howard further testified that McCullough provided a description of the second male who, according to her report, was between the ages of fifty-five (55) and sixty (60). The second *430 individual, however, was never apprehended.
Deputy Howard also testified that McCullough positively identified Defendant, through facial recognition, as one of the perpetrators he saw in the Plant. Once a positive identification had been made, Deputy Howard conducted an investigation inside of the Plant which revealed a prepared roll of copper that looked, in her opinion, prepared to steal. However, Deputy Howard was unable to |8make a determination as to where inside the Plant the copper wiring came from. No fingerprints were obtained from the copper wiring.
At trial, Defendant presented an alibi defense through Yvette Marks, Defendant’s fiancée. Ms. Marks testified that she and Defendant live together on Maple Street in Harvey, Louisiana, with her son, mother, and step-father, Efton Fugade. At about 9:00 a.m. on January 30, 2010, Ms. Marks was sitting on her front porch searching Facebook on her phone. From the front porch, Ms. Marks could see Defendant and her son by the ditch that runs along Fourth Street catching fishing bait. According to Ms. Marks, her son and Defendant were there for approximately 30 to 45 minutes before she sent her stepfather, Fugade, out to the ditch to retrieve her son. Ms. Marks stated that she remained on the front porch the entire time the incident concerning Defendant took place. About 10 to 15 minutes after Ms. Marks sent her stepfather to the ditch to retrieve her son, Ms. Marks noticed Defendant and her stepfather walking back to the house with a man she did not recognize. When Ms. Marks asked Defendant who the man was, he responded the man had tried to run him and her stepfather over with his truck. Ms. Marks admitted that she had not seen this happen because she was looking at Facebook on her phone.
Ms. Marks then testified that she went inside the house when Defendant and McCullough began to approach and further stated that she did not believe anything was wrong at that point in time. Ms. Marks’ stepfather also went inside the house with her, leaving Defendant outside with McCullough. About 20 minutes later, the police knocked on Ms. Marks’ door inquiring into the reason Defendant was by the ditch. Ms. Marks explained that he was catching bait to go fishing. The officer then advised Ms. Marks that Defendant was being arrested for trespassing.
Lastly, Ms. Marks testified that she never saw Defendant leave the ditch to |3go to the Plant, cut a hole in the fence, or bring any copper wire back to the house. Moreover, Ms. Marks stated she never saw Defendant or her stepfather run from the ditch to her house and did not notice any cuts on Defendant’s hands.
Ms. Marks’ stepfather, Efton Fugade, also testified for the defense. Fugade testified that on January 30, 2010, he went to the ditch that runs along Fourth Street to retrieve his grandson per Ms. Marks’ request. After his grandson returned to the house, approximately ten minutes passed before a white truck pulled up to area and nearly hit him and Defendant. The man in the truck, McCullough, approached Fu-gade and Defendant stating that someone had been inside his building. Fugade told the man that neither he nor Defendant had entered the Plant, nor had they left the location of the ditch that morning. McCullough then began to follow Fugade and Defendant back to their home on Maple Street. Fugade testified he went inside the house while Defendant remained outside arguing with McCullough. Later, a police officer arrived at Fugade’s home but did not question him. Fugade did not attempt to explain to the police officer what had transpired.

*431
ASSIGNMENT OF ERROR

The evidence is insufficient to uphold the conviction.

DISCUSSION

[2]

Defendant, in both his Original Brief and pro se Supplemental Brief, argues the testimony of McCullough was insufficient to prove Defendant attempted to burglarize the Plant. Specifically, Defendant asserts the State failed to prove he took a step in furtherance of entering a structure, and that he had the intent to commit a felony or theft inside the Plant.
|10In support of his assignment of error, Defendant contends McCullough presented conflicting statements concerning the incident in question. With regard to the first conflicting statement, Defendant claims McCullough initially testified that he only wanted to scare the alleged perpetrators away from the Plant, yet McCullough chose to follow them. Second, McCullough stated he never lost sight of the two perpetrators, keeping visual contact with them the entire time that they walked through the Plant and along the chain-link fence. However, Defendant argues that it is impossible that McCullough could have maintained visual contact with the perpetrators the entire time because the Plant is a physical structure, with walls, that McCullough likely cannot see through. Defendant further contends that McCullough could not have had a visual on the perpetrators the entire time because at one point McCullough went back to his truck, drove to the outside of the fence, and then called his boss. Defendant avers that, unless McCullough was walking backwards, it is highly unlikely that McCullough could have maintained visual contact. Finally, Defendant asserts that McCullough lost his visual of the perpetrators when he waited for the perpetrators to crawl through a hole in the fence and up through the ditch.
Defendant next argues that McCullough’s testimony was the only evidence presented that placed him inside the Plant. Further, Defendant claims that, while the State presented photographs of the damaged items in the Plant that included two rolls of copper wire, no fingerprints were admitted at trial, and McCullough conceded to the fact that he had only witnessed Defendant holding a roll of wire.
Finally, it is Defendant’s contention that both Yvette Marks and Efton Fugade testified Defendant was nowhere near the Plant on January 30, 2010. Additionally, McCullough offered no explanation as to the whereabouts of the second perpetrator, nor did he identify Efton Fugade as the second perpetrator.
^Alternatively, Defendant argues that, even if the evidence was sufficient to establish that the defendant was inside the Plant, the State failed to prove that he had the intent to commit a felony or theft inside. Defendant contends that, although McCullough saw the two men inside the Plant, he did not see them actively stripping wire from various electrical panels inside of the Plant. Defendant notes that .it would be illogical for the two men to strip the wire on the second floor, roll it up, and leave it upstairs while they worked *432 on the wiring on first floor of the Plant. Defendant argues that if he had the intent to steal the wire, he would not have dropped it when approached by McCullough. Instead, he could have easily taken it with him when he ran from the Plant.
In response, the State argues that both Newberry and McCullough established that Defendant did not have permission to be on Plant property. Moreover, the State contends that the testimony presented established that on January 30, 2010, McCullough entered the Plant and found two white males inside the Plant warehouse. One of males, later identified by McCullough as Defendant, had a reel of copper wire in his hand. The State further asserts that McCullough maintained constant visual contact with Defendant the entire time, following him from the Plant until he was apprehended. At the Plant, the identity of Defendant as one of the perpetrators was conclusively established and proven at trial through the testimony of Deputy Howard and McCullough. Thus, after having heard the testimony of the State witnesses, Brian Newberry, Deputy Serbrina Howard, and Mark McCullough, Jr., it is the State’s position that the jury placed greater weight on the testimony presented by the State, whose testimony established beyond a reasonable doubt that Defendant and another man were inside the Plant without authorization, with the specific intent to commit a theft of copper wire.
| 12The constitutional standard for testing the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).
An appellate court, in reviewing the sufficiency of evidence, must determine if the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. State v. Sosa, 05-213 (La.1/19/06); 921 So.2d 94, 99. Additionally, when circumstantial evidence forms the basis of the conviction, the evidence, “assuming every fact to be proved that the evidence tends to prove ... must exclude every reasonable hypothesis of innocence.” Id.; LSA-R.S. 15:438. “When a jury rationally rejects the hypothesis of innocence advanced by the defendant, that hypothesis fails, and ‘the defendant is guilty unless there is another hypothesis which raises a reasonable doubt,’ i.e., an ‘alternative hypothesis ... sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.’ ” Id., citing State v. Captville, 448 So.2d 676, 680 (La.1984).
The trier of fact makes credibility determinations, and may, within the bounds of rationality, accept or reject the testimony of any witness, at its discretion. Sosa, 05-213, 921 So.2d at 101. Absent internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Caffrey, 08-717 (La. App. 5 Cir. 5/12/09); 15 So.3d 198, 202, writ denied, 09-1305 (La.2/5/10); 27 So3d 297. The credibility of witnesses is not to be reweighed on | ,aappeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97); 694 So.2d 1052, 1056. The appellate court may impinge on the fact-finder’s discretion only to the extent necessary to guarantee the fundamental due process of law. Sosa, 05-213, 921 So.2d at 101.
*433 In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the identity of the perpetrator. State v. Searls, 04-790 (La.App. 5 Cir. 1/25/05); 895 So.2d 40, 43. Where the key issue is identification, the State is required to negate any reasonable probability of misiden-tification in order to carry its burden of proof. State v. Vasquez, 98-898 (La.App. 5 Cir. 2/10/99); 729 So.2d 65, 69. “Positive identification by only one witness is sufficient to support a conviction.” State v. Benoit, 07-35 (La.App. 5 Cir. 5/29/07); 960 So.2d 279, 282.
In the instant case, Defendant was charged with simple burglary but was convicted of the lesser included offense of attempted simple burglary under LSA-R.S. 14:27 and 14:62. Simple burglary is defined in LSA-R.S. 14:62 as “the unauthorized entering of any dwelling, vehicle, watercraft, or other structure, movable or immovable ... with the intent to commit a felony or any theft therein ...” An attempt occurs when “any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether under the circumstances he would have actually accomplished his purpose.” LSA-R.S. 14:27(A).
Therefore, a conviction for attempted simple burglary requires proof that the defendant committed “an act for the purpose of and tending directly toward” the unauthorized entry of a dwelling or other structure “with the intent to commit a felony or any theft therein.” LSA-R.S. 14:27; LSA-R.S. 14:62; State v. Nelson, 2008-0584 (La.App. 4 Cir. 12/17/08); 3 So.3d 57, 60, writ denied, 10-166 (La.1/7/11); 52 So.3d 881. Entry is accomplished whenever any part of defendant’s person passes the line of the threshold, and it is sufficient that any part of the person intrudes, even momentarily, into the structure. State v. Smith, 02-1018 (La.App. 5 Cir. 3/11/03); 844 So.2d 119, 125.
Attempted simple burglary is a specific intent crime. State v. Petty, 99-1307, p. 3 (La.App. 5 Cir. 4/12/00); 759 So.2d at 946, 949, writ denied, 00-1718 (La.3/16/01); 787 So.2d 301. “Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” LSA-R.S. 14:10(1). Specific intent is a state of mind and, therefore, need not be proven as fact, but may be inferred from the circumstances and actions of the accused. Petty, 991307, 759 So.2d at 949.
In the present case, there was sufficient evidence to convict Defendant of attempted simple burglary. At trial, the State put forth the requisite evidence to prove that Defendant entered the Plant without authorization. To support this essential element, Newberry, owner of Bayou Electrical and caretaker of the Chemtu-ra Plant, testified that Defendant was not employed by Bayou Electric and did not have permission to be on the property. McCullough also testified that Defendant did not have permission to be in the warehouse, nor did he have permission to have the copper wire in his possession. After following Defendant from the Plant and waiting for the police to arrive, McCullough confirmed for the police that Defendant, who had been relocated to the Plant for identification, was the same individual he had seen inside the plant holding the copper wire. McCullough also confirmed for Deputy Howard that the roll of copper wire that had been dropped by Defendant remained in the same location where *434 McCullough | ¶ shad initially confronted him in the Plant warehouse. Moreover, the State established that electrical panels at the Plant had been broken into, and that copper wire had been stripped from them. Additionally, McCullough testified that additional rolled up wire had been discovered on the second floor, and hand tools were also present, which had not been there the following evening.
Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that Defendant had the specific criminal intent to steal the copper wire but failed in his attempted theft due to the unanticipated presence of McCullough. LSA-R.S. 14:27 does not require that Defendant actually accomplish his purpose.
By returning the guilty verdict, the jury obviously believed the testimony of the State’s witnesses over the defense’s witnesses. Moreover, the circumstantial evidence is sufficient to infer the intent to commit a theft of copper wire. After reviewing the record, rational jurors, after viewing the evidence in the light most favorable to the prosecution, could have concluded beyond a reasonable doubt that Defendant was guilty of attempted simple burglary. Accordingly, we conclude the evidence presented was sufficient to sustain Defendant’s conviction of attempted simple burglary pursuant to LSA-R.S. 14:27 and 14:62.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 387 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals the following error patent in this case.
While the commitment indicates that Defendant’s five-year sentence is to be served at “hard labor,” the transcript only indicates that Defendant’s sentence will be served “in the Department of Corrections.” Moreover, the transcript indicates Defendant was sentenced pursuant to LSA-R.S. 15:529.1, which requires that all | lfisentences imposed under said section be served at hard labor. See, LSA-R.S. 15:529.1(G).
Generally, when there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). Although the trial court did not state that Defendant’s sentence was to be served at hard labor, “a sentence committing a prisoner to the Department of Corrections is necessarily at hard labor.” State v. Lawson, 04-334 (La.App. 5 Cir. 9/28/04); 885 So.2d 618, (citing State v. Lisenby 534 So.2d 996, 998 (La.App. 3 Cir.1988)). Accordingly, we find that no corrective action is necessary.

AFFIRMED

. The record does not reflect that Defendant’s other pre-trial motions were disposed of prior to trial. However, it is well established that a defendant waives all pending motions by permitting trial to proceed without raising the issue that his pre-trial motions were neither heard nor ruled upon. State v. Thomas, 08-1171, p. 5 (La.App. 5 Cir. 4/28/09); 13 So.3d 595, 599 (citing State v. Fletcher, 02-707, p. 5 (La.App. 5 Cir. 12/30/02); 836 So.2d 557, 559, writ denied, 03-0409 (La. 10/10/03); 855 So.2d 334).

. Counsel for Defendant filed an Original Brief on May 16, 2011, asserting one assignment of error, namely, the evidence is insufficient to uphold the conviction. Subsequently, on June 20, 2011, Defendant filed a pro se Supplemental Brief to the Original Brief asserting the identical Statement of the Case, Procedural History, Statement of Facts, Assignment of Error, Issue Presented, and similar arguments concerning the alleged insufficient evidence. Due to the analogous nature of these submissions, and to avoid repetition, both arguments presented in Defendant’s Original Brief and pro se Supplemental Brief will be addressed as one.